**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**PATRICIA ALLEN,**

      **Plaintiff,**

**v.**                                                                    **Case No.  8:03-cv-877-T-TBM**

**ROBERT S. MUELLER, III,**

      **Defendant.**

                              **/**

---

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

THIS CAUSE was before the court for non-jury trial from April 19, 2005, through

April 22, 2005.  In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court

hereby enters its findings of fact and conclusions of law.[1]

The Plaintiff, Patricia Allen, sues Robert S. Mueller, III, in his official capacity as

Director of the Federal Bureau of Investigation ("FBI"), pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., for alleged retaliation by the FBI

after she opposed unlawful discrimination practices and otherwise participated in protected

activity by filing an internal equal employment opportunity ("EEO") complaint.  The

gravamen of Plaintiff's complaint is that she was denied the opportunity to fulfill a life-long

dream of becoming a FBI Special Agent when she was retaliated against after she opposed

---

[1]At the conclusion of the trial, the court requested the parties to submit proposed
findings of facts and conclusions of law.  These too have been considered.  <u>See</u> (Docs. 74-75).
The court also reserved ruling on the Defendant's renewed motion for directed verdict and
motion for judgment as a matter of law at the conclusion of trial.  Those motions (Doc. 72)
are **DENIED**.

discriminatory activities in the workplace and was dropped from the new agent process. Plaintiff seeks lost wages and benefits, compensatory damages, front pay and other equitable relief, together with fees and costs.  (Doc. 74).

The Defendant denies any discrimination against Plaintiff and asserts that Plaintiff has not met her burden of proof to establish a retaliation claim.[2]  In particular, the Defendant maintains that Plaintiff did not engage in protected activity.  Thus, it argues that the FBI's conduct throughout was lawful and Plaintiff could not have engaged in statutorily protected activity as she neither had an objectively reasonable belief nor a good faith subjective belief that it engaged in discriminatory conduct.  Defendant concedes that the denial of an opportunity to participate in a new agent class was an adverse employment action.  It urges, however, that matters which preceded the rescission of Plaintiff's conditional offer of employment as a Special Agent such as a low performance evaluation, her referral to an EAP counselor, a forced fitness for duty examination, the temporary loss of her "top secret" security clearance, and her temporary suspension from work were not adverse employment actions.  In any event, the Defendant argues that Plaintiff cannot establish the necessary causal link between her protected activity and the denial of the opportunity to participate in new agent class.  Finally, Defendant maintains that even if Plaintiff can establish a *prima facie* case of retaliation, the FBI had legitimate business reasons for all of its employment

---

[2]As a preliminary matter, Defendant asserts that, to the extent Plaintiff relies upon the suspension of her security clearance, this court has no jurisdiction to consider the matter as the decision concerning the issuance or non-issuance of a security clearance is a matter within the purview of the executive branch.

actions directed toward Plaintiff and she has failed to demonstrate any pretext in such reasons. (Doc. 75).

# I.

In order to establish the claim of unlawful retaliation, the Plaintiff must establish that: 1) she engaged in statutorily protected activity; 2) an adverse employment action then occurred; 3) the adverse employment action was causally related to the Plaintiff's statutorily protected activities; and 4) she suffered damages as a proximate or legal result of such adverse employment action.  See 11th Cir. Pattern Jury Instr. (Civil), 1.9.3 (1999); see also Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) (summary judgment context).

To prove that she engaged in a statutorily protected activity,[3] Plaintiff must establish that she "had a good faith, reasonable belief that the [FBI] was engaged in unlawful employment practices," *that is,* that she subjectively believed that the employer was engaged in unlawful employment practices and her belief was objectively reasonable in light of the facts and the record presented.  See Weeks, 291 F.3d at 1311-12 (quoting Little v. United Tech., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997)).  For the purpose of establishing a claim of retaliation, even informal and/or internal complaints of discrimination are statutorily protected conduct under the opposition clause of Title VII.  Rollins v. Fla.

---

[3]Under Section 704(a) of Title VII, protected activity consists of either 1) opposing a practice made unlawful by the employment discrimination statutes, or 2) filing a charge, testifying, assisting, or participation in any manner in an investigation, proceeding or hearing under the applicable statute.  42 U.S.C. § 2000e-3(a).

Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989).  In this circuit, however, informal opposition by an employee will not invoke the protections of the participation clause of Title VII.  E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).

As contemplated by Title VII, "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (2000) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)).  Conduct that falls short of an ultimate employment decision may still be cognizable under Title VII but must meet "some threshold level of substantiality."  Id. (quoting Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998)).  "[N]ot everything that makes an employee unhappy is an actionable adverse action."  Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quoting Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir. 2001)).  Rather, the employer's action must impact the terms, conditions, or privileges of the employee's job in a real and demonstrable.  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).  Moreover, the employment action must be materially adverse from a subjective and objective standpoint under all the facts and circumstances.  Id.

For an adverse employment action to be "causally related" to a statutorily protected activity, it must be shown that but for the protected activity, the adverse employment action would not have occurred.  Or, in other words, it must be shown that the protected activity was a substantial, motivating cause that made a difference in the defendant's decision.  See 11th

Cir. Pattern Jury Instr. (Civil), 1.9.3 (1999).  This circuit recognizes the "cat's paw" theory of causation where the plaintiff shows that the harasser employed the decision-maker as his or her "cat's paw," that is, where the proof reveals that the decision-maker acted in accordance with the harasser's decision without himself evaluating the employee's situation.  "In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."  Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998).

Defendant contends that to the extent that Plaintiff's claims are based on the temporary suspension of her security clearance, this court does not have jurisdiction to hear this case.  In support of its contention, Defendant relies on Dep't of the Navy v. Egan, 484 U.S. 518 (1988) and Hill v. White, 321 F.3d 1334 (11th Cir. 2003).  Plaintiff responds that these decisions do not apply in this instance because the court is not required to rule on whether Plaintiff should maintain a security clearance; rather, at issue is the impact the suspension had on her application to become a special agent with the FBI.  Relying primarily on Jones v. Ashcroft, 321 F.Supp.2d 1 (D.D.C. 2004), Plaintiff contends that this consideration is at least one step removed from the security clearance decision and therefore 42 U.S.C. § 2000e-2(g) is inapplicable.  Section § 2000e-2(g) states in pertinent part:

> it shall not be an unlawful employment practice for an employer
> to fail or refuse to hire and employ any individual for any position
> . . . if–
> (1) the occupancy of such position . . . is subject to any require-
> ment imposed in the interest of the national security of the
> United States under any security program in effect pursuant to or
> administered under any statute of the United States or any Executive
> order of the President; and
> (2) such individual has not fulfilled or has ceased to fulfill that

requirement.

In <u>Egan</u>, the Supreme Court held that the Merit Systems Review Protection Board did not have the authority to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse employment action as such authority was vested in the executive.  484 U.S. at 530-33.  In addressing <u>Egan</u>, this Circuit stated that the Supreme Court "made clear that a decision concerning the issuance or non-issuance of security clearance is a matter within the purview of the executive and [is] not to be second guessed by the judiciary unless Congress has specifically provided otherwise." <u>Hill</u>, 321 F.3d at 1336.  Citing <u>Egan</u> and <u>Becerra v. Dalton</u>, 94 F3d 145 (4th Cir. 1996), with approval, the Eleventh Circuit held the court lacked jurisdiction over a civilian employee's Title VII claim that the military's *initiation* of a security clearance investigation was motivated by age discrimination, reasoning that to review the initial stages of a security clearance decision is to review the basis of the determination itself.  <u>Hill</u>, 321 F.3d at 1335-36; <u>see</u> <u>also</u> <u>Ryan v. Reno</u>, 168 F.3d 520 (D.C. Cir. 1999); <u>Perez v. F.B.I.</u>, 71 F.3d 513 (5th Cir. 1995); <u>Brazil v. Dep't of the Navy</u>, 66 F.3d 193 (9th Cir. 1995).


II.

Regarding the Plaintiff's claim that she was retaliated against for opposing the resident degree policy of the FBI, the facts urged in support of this claim are largely undisputed and need not be set forth in detail.  <u>See</u> (Doc. 47).  The preponderance of the evidence establishes that Plaintiff, a paralegal specialist with the legal office of the Tampa division of the FBI, sought to become a Special Agent with the FBI beginning in early 2000.

After passing initial tests, she was advised that she was disqualified from further consideration for the Special Agent position because she lacked the necessary resident degree called for by FBI policy.  Believing the decision was erroneous, Plaintiff undertook to show that she had the necessary resident degree and to effect a change in the policy.  At the outset of her quest to get the policy changed, the evidence does not clearly support that Plaintiff harbored a subjective belief that the policy was discriminatory against her because of her gender.  However, the preponderance of the evidence indicates that her opinion in this regard did evolve, and the matter of the discriminatory impact of this policy on women, members of the military, and minorities was included in the arguments she and others made to effect this change.  While there is little evidence of record concerning the impact of this policy, what is of record does suggest that Plaintiff's view that the policy had a disparate impact on women and others was ultimately held in good faith and was objectively reasonable.  The policy was changed in or about early December 2000, and while the FBI took a different view of the matter, Plaintiff believed that she was a moving force behind the change and she pursued recognition.[4]  On December 20, 2000, Plaintiff sent an e-mail communication ("EC") to the Deputy Director of the FBI claiming credit for the policy change.  (Def. Exh. 32).  The EC caused Plaintiff's superiors a great deal of distress, and it particularly embarrassed and angered her immediate supervisor, Chief Division Counsel ("CDC") Peter R. Wubbenhorst, Esq. ("Wubbenhorst").  Although the evidence suggests that Wubbenhorst had supported

---

[4]Although not well developed in this record, suggestions resulting in changes in policy or practice at the FBI could apparently result in a monetary award and recognition for individual employees.

7

Plaintiff's position that she had such a resident degree, he was highly critical of the manner in which she sought credit for the change in policy and he "counseled" her for ignoring the chain of command and sending what he viewed as an immature and insulting EC to the Deputy Director.[5]

This incident was not forgotten by Wubbenhorst. He referenced it again in the Plaintiff's annual performance review in July 2001, and along with other matters set forth in the review, this incident prompted him to give Plaintiff a lower rating in the Critical Element of "Communication Skills." (Def. Exh. 45). Thereafter, this evaluation was included with a November 9, 2001, EC drafted by Wubbenhorst to departments within FBI National Security Administrative Services in Washington, D.C., to "assist" in their assessment of Plaintiff's fitness for duty and her access to top secret material. (Def. Exh. 52). As discussed below, Plaintiff's security clearance had been temporarily suspended and thereafter, her February 2001 conditional appointment as Special Agent was rescinded.

In August 2001, Plaintiff was thanked for her contribution to the diligence and urgency her efforts brought to the FBI's consideration of the policy change. (Def. Exh. 46).

As for her claim that she was discriminated against by reason of her opposition to the workplace hostility and harassment by Special Agent Maria Vasquez ("Vasquez") and by

---

[5]In Wubbenhorst's view, Plaintiff evidenced poor judgment in sending the EC, the policy had been successfully challenged, and Plaintiff should have been grateful and moved on. Instead, he saw her EC as a "gotcha" type communication, one rubbing salt in some wound that he perceived may have occurred during the process to change the policy. This was not the first time Plaintiff was reminded of the importance of following the chain of command. See (Def. Exh. 25).

reason of her participation in the informal EEO process,[6] the court makes the following additional findings by a preponderance of the evidence. At all times during her employ, Plaintiff was a highly competent employee as reflected in her performance evaluations. (Def. Exhs. 4, 5, 20, and 45). She held a top secret security clearance and had access to matters so classified. Plaintiff brought a "can-do" attitude to the job and was generally well regarded. While her self-confidence and assertiveness were usually positive features of her work, at various times they resulted in conflicts with others within the Tampa division. She did not take criticism well; when criticized, she became defensive quickly and was generally unreceptive even when the criticism was merited.[7]

During her initial pursuit of the Special Agent position, Plaintiff was deemed by her supervisors to be highly qualified for the position. (Pl. Exh. 1). The offer of a conditional appointment in February 2001 reflected the FBI's intention to hire Plaintiff as a Special Agent, although such was contingent upon any number of factors and was not guaranteed. (Def. Exh. 39). Plaintiff's desire to become a Special Agent and her conditional appointment as such were well known to her supervisors in the Tampa Division of the FBI.

---

[6]This claim is cognizable, if at all, under the opposition clause of Title VII. See Total Sys., 221 F.3d at 1174-75.

[7]A good example of Plaintiff's good and bad qualities was provided by Arlene Vargas ("Vargas"), a long-time employee of the FBI and the Administrative Officer for the Tampa division. In March 2001, Vargas met with Plaintiff to straighten out a minor time and attendance matter. As Vargas described the meeting, Plaintiff immediately became defensive and unreceptive and she had an answer for everything. Vargas was angered by her attitude and reported the matter to Wubbenhorst. (Def. Exh. 38). While Vargas would otherwise describe Plaintiff as an outstanding employee and a "go-getter," her attitude could become defensive quickly and she did not handle criticism well.

9

Until her transfer out of the department in or about August 2001, Vasquez was also assigned to the legal department and acted as assistant division counsel.[8]  At times when Wubbenhorst was out of the office, Vasquez had direct supervisory authority over Plaintiff. Plaintiff and Vasquez shared a mutual dislike for each other and there appears a complete lack of respect by one for the other.  Plaintiff resented any efforts by Vasquez to assert authority over her.  On the other hand, Vasquez resented Plaintiff because of her looks and the way she dressed, comments she made in the workplace, her lack of respect for Vasquez and others in the legal department, and what Vasquez perceived as a self-centered attitude. At least part of this animosity was gender-based as Vasquez obviously did not appreciate Plaintiff's feminine style.

In late June 2001, while she was acting in relief of Wubbenhorst, Vasquez and Plaintiff had two significant run-ins.  In the first, Vasquez discovered that Plaintiff had intentionally by-passed her on signing outgoing mail.  This was clearly contrary to the directive of Wubbenhorst and Plaintiff was properly called out on it.  In the second, Plaintiff and Vasquez engaged in a silly but loud argument concerning the morning newspapers. Vasquez's threat to "write her up" for insubordination prompted Plaintiff to threaten to file a hostile work environment complaint against Vasquez.  In response, Vasquez invited the complaint and added it would be the best thing that could happen because an investigation would reveal Plaintiff's deficiencies and then everyone would know that she would not make a good Special Agent.  Both women contacted Wubbenhorst at his home.  He instructed

---

[8]Like Wubbenhorst, Vasquez too had a law degree but was not a member of the Bar.

Vasquez to document the matter, obtain witness statements, and talk to the agent in charge.[9] By Vasquez's account, Plaintiff was "defiant," "insubordinate," and engaged in "disrespectful" and "unprofessional conduct." (Def. Exh. 41). It also appears that the report was intended by Vasquez to be routed to Plaintiff's pending applicant file. Unquestionably, Vasquez was opposed to the Plaintiff becoming a Special Agent and her opinion was known to Wubbenhorst.

Upon his return and after speaking with Vasquez and Plaintiff, Wubbenhorst also prepared a memorandum, noting what he called a "disturbing downward trend" in Plaintiff's interpersonal relations and communication skills during the preceding six months. (Def. Exh. 42). This memorandum recounted the manner in which Plaintiff had sought credit for the resident degree policy change, the ongoing difficulties between Vasquez and Plaintiff, the March incident between Plaintiff and Vargas, Plaintiff's disregard for his direct orders regarding the signing of mail during his absence, and the defensive manner in which Plaintiff responded to his counseling. The memorandum reflects that Wubbenhorst told Plaintiff that she could pursue a hostile work environment claim, but in his view the "real issue" was Plaintiff's insubordination to him, a matter he intended to address in her upcoming performance review ("PAR.") Id.

On July 11, 2001, Plaintiff met with Molly DuParl ("DuParl"), a Tampa division EEO counselor, and made a complaint of hostile work environment against Vasquez. The

---

[9]According to Wubbenhorst, Plaintiff wasn't asked to write-up her side of the matter because Vasquez was the superior or higher level employee and Plaintiff's conduct reflected insubordination.

records of this complaint and this witness's notes on such have been destroyed.  Duparl claimed that the FBI had a policy of destroying such records after two years if the complaint did not result in a formal EEO complaint.  As a result, all DuParl had by way of records was a report she compiled in May 2002 after Plaintiff formally complained of retaliation.  See (Def. Exh. 44.)  After using her notes in preparation of that report, the notes were destroyed. Testifying from her report, DuParl recounted that Plaintiff complained of mistreatment in the workplace at the hands of Vasquez for more than three years.  In particular, she complained that Vasquez was hostile toward her, belittled her, treated her like a child, talked over her, wouldn't process her mail, spoke badly of her in front of others, and threatened that she would see that Plaintiff never became a Special Agent.  Neither DuParl's testimony nor her report reflect an express claim that the hostility toward Plaintiff was gender-based, although Plaintiff claimed she made such a complaint.  Because DuParl did not believe the complaints about Vasquez involved a protected class, she determined that the matter was a non-EEO matter and she moved to resolve it informally.[10]  In doing so, she spoke with Wubbenhorst, who indicated that he did not believe the complaint was an EEO matter either and advised he would address the matter with Plaintiff at her PAR.  According to DuParl, Wubbenhorst did tell her that he would not use Vasquez in relief anymore.  Plaintiff testified that this was a

---

[10]This portion of the evidence is troubling in that DuParl's testimony suggests her destruction of the evidence was in violation of the policy rather than in compliance therewith. Within two years of this first complaint, Plaintiff did make a formal EEO complaint for retaliation and yet DuParl destroyed her notes after compiling her report.  Plaintiff's original complaint and the notes compiled by DuParl may well have cleared up the dispute over whether Plaintiff actually claimed gender discrimination.  Based on the deliberate destruction of this material, I find Plaintiff' testimony, namely, that she did claim gender discrimination, to be the accurate testimony.

satisfactory resolution of her complaint.  Whether because of this complaint or otherwise, Vasquez was subsequently transferred out of the legal department.

On July 13, 2001, Wubbenhorst rated Plaintiff as "exceptional" on two Critical Elements under annual review, but only "fully successful" in the third category for "Communication Skills."  Overall, he rated the Plaintiff "superior" on this PAR.  (Def. Exh. 45).  Previously, Plaintiff had never received a rating other than "exceptional" or "superior" for any category of review.  See (Def. Exs. 4, 5, and 20).  According to Wubbenhorst, a "fully satisfactory" rating is a mid-range rating, which he would equate with a "C" grade.  In explanation of the fully satisfactory rating, Wubbenhorst cited her poor judgment, the decline in interpersonal relations, and the lack of respect for the chain of command.  Specifically, he again recounted the manner in which Plaintiff had sought credit for the resident degree policy change, her difficulties with Vasquez, the March incident with Vargas, and the poor manner in which she had responded to his counseling.  The evaluation indicated that relating with others and providing professional service would be added as a Critical Element in Plaintiff's next rating period.  Plaintiff was surprised and disappointed by the rating.  By Wubbenhorst's account, Plaintiff thereafter became cold and hostile toward him.  While she was not pleased with the lower evaluation, Plaintiff insists the evaluation did not change how she performed her job.

Plaintiff's performance at work was both good and bad after she received this PAR.  To her relief, Vasquez moved out of the legal office.  During the period after the 9/11 disaster, by all accounts Plaintiff worked very hard in the legal unit.  However, Wubbenhorst testified that Plaintiff continued to display a negative attitude toward him, and he documented

problems she had with others in the workplace and a near disclosure of secret material to an assistant United States Attorney who lacked the necessary clearance.[11]  According to Wubbenhorst, this came to a head at the end of October 2001.  Because Plaintiff was angry and appeared to be having problems, Wubbenhorst met with an employee assistance program ("EAP") counselor, Pam Salerno.  She advised Wubbenhorst to write the matter up.  He did so in an EC which, among other things, directed Plaintiff to meet with EAP counselor Vince McNally ("McNally") on November 1, 2001.  See (Def. Exh. 50).  McNally and Wubbenhorst went over the EC and discussed Plaintiff prior to McNally meeting her. Wubbenhorst could not recall that he had also spoken with Allen Hirsch ("Hirsch") in the Personnel Security Unit at FBI headquarters in Washington, D.C., before initiating the referral to EAP.  This testimony is troubling given the testimony of Hirsch as set forth below. While the Plaintiff was surprised by the referral, she did appear as directed.

        McNally met with Plaintiff on November 1, 2001, and November 5, 2001, for about one hour each time.  It is apparent that he had certain preconceived ideas about Plaintiff that only could have come from his speaking with Wubbenhorst and drew conclusions highly significant to the Plaintiff's subsequent loss of security clearance from this information.[12]  It

_____

        [11]Many of the problems Wubbenhorst identified as occurring after the PAR are set forth in his EC of October 31, 2001.  (Def. Exh. 50).  Other than to generally deny that her work performance changed or that she had problems with others in the office, Plaintiff did not refute these documented events and the court is left to conclude that she continued to harbor some hostility toward Wubbenhorst and there were minor run-ins between Plaintiff and others that required his attention.

        [12]For instance, the suggestion that Plaintiff suffered from an eating disorder or bulimia and had withdrawn from people in the office must have come to McNally via his conversation with Wubbenhorst.  Except for anecdotal evidence about the Plaintiff vomiting on the day of

also appears that the fact of Plaintiff's EEO complaint was made known to McNally.[13]

Suffice it to say, Plaintiff felt she was being retaliated against and she was unwilling to sign

any agreement proposed by McNally or follow any course of action he suggested to address

the stated problems.  See (Pl. Exh. 23).  However, she was willing to meet with Wubbenhorst

and McNally to clear the air.  This did not occur and Plaintiff was terminated from the EAP

program.  (Pl. Exh. 24).  McNally's conclusions about the Plaintiff were almost entirely

negative and in some instances, fairly outrageous given his education, training and

experience.[14]  See (Def. Exh. 51, Pl. Exh. 24).  Significantly, McNally concluded that

Plaintiff  was a threat to herself and others, had no clear perception of reality, and was not

trustworthy, matters which impacted on her national security clearance and access to top

secret matters.  By his determination, EAP confidentiality was waived in these circumstances

and he sought to meet with the Tampa division management.

　　　　McNally first contacted Wubbenhorst about his conclusions, and then the Tampa

division SAC, Larry Albert, and ASAC, Jonathan Solomon ("Solomon"), both of whom,

---

the second phase of her testing, there appears no foundation for any assumption of an eating
disorder by either Wubbenhorst or McNally.

[13] McNally's conclusion that Plaintiff engaged in consistent bickering with co-workers
and superiors "resulting in instituting litigious action, . . ." (Doc. 51) also appears to have
come from Wubbenhorst and, in the circumstances of this case, can only relate to her EEO
claim.

[14]Ultimately, the FBI's Health Care Programs Unit determined that McNally's
conclusions were unfounded and beyond his expertise to make.  Apart from evidence to
support that Plaintiff was angry and resentful toward Wubbenhorst and Vasquez and that she
occasionally had minor run-ins with other employees, McNally's conclusions on Plaintiff's
psychological state were unsupported or of a character he was not qualified to make.  Dr.
Yoder's testimony concerning McNally (discussed below) is thoroughly convincing in this
regard.

15

along with Wubbenhorst, met with McNally on November 6, 2001, to discuss his conclusions.  Wubbenhorst and Solomon claimed to be surprised by the conclusions, but it was agreed that the conclusions needed to be reported to FBI headquarters.  Solomon spoke with Hirsch at the Personnel Security Unit ("PSU").[15]  On the basis of the report of behavioral problems in the workplace, the near release of classified information, an eating disorder and heavy exercise, Hirsch decided to suspend the Plaintiff's security clearance pending a psychiatric and psychological examination.  A letter to that effect was forwarded to Plaintiff that same day.  (Def. Exh. 53).  On November 7, 2001, Plaintiff was suspended with pay and escorted off the premises because she could not work at the Tampa office without a security clearance.

At the request of Hirsch and on the instructions of Solomon, Wubbenhorst followed up with an EC which was forwarded to the PSU, the Personnel Assistance Section, the Applicant Processing Section, and the Reinvestigation Unit Office of Security at FBI headquarters.  (Def. Exh. 52).  According to Hirsch's testimony, any of the reasons given in the EC would justify the suspension of an employee's security clearance as they reflected poor insight or judgment or a lack of stability.  A memo from Hirsch to his superior, Mr.

---

[15]The PSU managed matters related to security clearances.  As it turns out, this was not the first time Hirsch had been contacted about Plaintiff.  According to him, Wubbenhorst had contacted him previously, and it appears appropriate to conclude that this contact occurred prior to Plaintiff's referral to EAP.  To Hirsch, the matter was a personnel matter rather than a security matter, and he advised Wubbenhorst to refer Plaintiff to EAP and to document the actions, noting that the appropriate inquiry was into Plaintiff's insight and judgment.  This testimony and Wubbenhorst's inability to recall this conversation lend credence to the Plaintiff's contention that Wubbenhorst's true motivation was to have her security clearance suspended, a move Wubbenhorst knew would prevent her from becoming a Special Agent.

16

Shubert, the Security Programs Manager, illustrates the impact of McNally's conclusions on the actions taken by headquarters.  According to the memo, Plaintiff's "Bulima (sic) Nervosa," anger toward her supervisor, and refusal of the EAP referral warranted the order that she undergo a psychiatric and psychological examination to determine her fitness for duty.  (Pl. Exh. 19).

On November 19, 2001, before any psychological fitness for duty examination could occur, Plaintiff was notified by the Applicant Employment Unit that her conditional offer of appointment as a Special Agent was rescinded.  (Def. Exh. 56).  The notice stated generally that the basis for the rescission was Plaintiff's employment history and the suspension of her security clearance.  (Def. 56).  A file copy of the letter at FBI headquarters, obtained under the FOIA, makes clear that the rescission was directly related to the loss of security clearance.  (Pl. Exh. 13).  The notations, which are added to the file copy for internal use at the FBI, cite to the October 31, 2001, EC from Wubbenhorst to EAP (Doc. 50) and his November 9, 2001, EC to Hirsch at PSU (Doc. 52) as support for the action.

Still desiring to go to new agent class, Plaintiff arranged her own medical and psychological fitness examinations.  Amanda Wu, M.D., conducted blood work and a physical examination of Plaintiff on November 9, 2001.  By Dr. Wu's report, Plaintiff's physical and laboratory examinations were normal and she "had no restrictions for work." (Pl. Exh. 12).  Subsequently, Plaintiff arranged an appointment with Gerald J. Hodan, Ph.D., a licensed psychologist and Diplomate in the College of Forensic Examiners, in lieu of the doctor arranged for by the FBI.  Dr. Hodan examined and tested Plaintiff on December 21, 2001.  Test results revealed no significant psychopathology and the psychologist concluded

17

that Plaintiff suffered no particular mental disorder and that there were no contraindications to her pursuing her career goal of becoming a Special Agent.  (Pl. Exh.15).

Although the Health Care Programs Unit at FBI headquarters had followed Hirsch's lead and directed such a psychological examination, it is apparent that unit doctor, James E. Yoder, M.D., had serious doubts as to McNally's qualifications and the conclusions made in reliance on his diagnoses even before the evaluation was completed.  See (Def. Exh. 55).  Dr. Yoder's testimony reveals that this case came to his attention in a rather unusual manner, as Plaintiff's security clearance had already been suspended.  He testified that although a fitness for duty examination was directed in the unusual circumstances of this case, he found no basis for such referral.  According to Dr. Yoder, had this matter come to him in the usual manner, he would not have recommended such an examination but would have directed that the matter first be handled administratively through EAP.  It was his opinion that McNally was simply unqualified to render the psychological assessments and opinions that he rendered and too much emphasis had been lent to his conclusions by Tampa management.

On or about January 3 or 4, 2002, Plaintiff was advised by an FBI ombudsperson that her security clearance was being reinstated.  In a letter dated January 14, 2002, Plaintiff was notified that her top secret security clearance was restored and she was cleared to return to work in the legal department.  See (Def. Exh. 63).  Upon her return, she was assigned to a different work station, which was slightly farther away from Wubbenhorst because he did not trust her listening in on his business.  According to Wubbenhorst, however, Plaintiff performed without a problem.  Still interested in becoming a Special Agent, Plaintiff sent a letter dated January 4, 2002, along with her medical records and a request to be reinstated, to

18

Sandra Gale, the applicant coordinator in the Tampa division.  (Def. Exh. 61).  She was also

in contact with FBI ombudsperson, Sarah Zeigler.  At some point, Zeigler asked James

Burrus, then chief of the Applicant Processing Section at FBI headquarters, to review the

matter.  Although the matter had not come to him in the usual manner of an appeal, he treated

Plaintiff's memorandum as an appeal of the decision to rescind Plaintiff's conditional

appointment.  Upon his review of matters within Plaintiff's file, he determined that Plaintiff's

request for reactivation of her processing for the Special Agent position should be denied.  In

a letter to Plaintiff dated March 5, 2002, he indicated that her lack of good judgment, poor

interpersonal skills while working in Tampa, and refusal to accept responsibility for her

actions justified the denial.  (Def. Exh. 64).

Plaintiff left the FBI on July 15, 2002, to take a job as an agent with the Department

of Health and Human Services Office of Inspector General.  She maintains her top secret

security clearance.

III.

From this review of the facts, Plaintiff twice sought to oppose discriminatory

practices or conduct within the purview of Title VII.  Her opposition to the resident degree

policy was subjectively and objectively reasonable.  However, Plaintiff fails to prove that her

opposition to this policy caused any adverse employment action to be taken against her.  In

the first instance, the evidence suggests that Plaintiff's supervisor were wholly unopposed to

her efforts to change the policy and, at one point, Wubbenhorst affirmatively sought to assist

the effort.  It was only after the policy was changed and Plaintiff then sought to gain

19

recognition for having brought about the change that she ran into problems with her supervisors and, in particular, Wubbenhorst. As a matter of law, the court cannot conclude that her efforts to gain recognition for the policy change were activity protected under Title VII. Even if they were, the court cannot find that Wubbenhorst's (or other's) criticism of her for avoiding the chain of command and using poor judgment in e-mailing the Deputy Director was an adverse employment action under the applicable standard, as it had little or no effect on the terms and conditions of her employment. While it is correct that many months later Wubbenhorst cited this incident as a reason in support of his "fully successful" rating of Plaintiff's communication skills and the FBI later cited Plaintiff's allegedly poor judgment as a basis to warrant the rescission of her conditional appointment as Special Agent, the court cannot find the PAR evaluation was a separate adverse employment action. In any event, the court finds there is no evidence that the rescission of Plaintiff's conditional appointment was made in retaliation for her having opposed the resident degree policy.

Plaintiff also sought to oppose the hostile workplace treatment at the hands of Special Agent Vasquez. In part, Vasquez's hostility toward Plaintiff was gender-based, and given the testimony by other agents and after hearing from Vasquez first hand, the court concludes Plaintiff's opposition was subjectively and objectively reasonable.[16] Plaintiff

---

[16]There is little evidence to demonstrate objectively the pervasiveness or severity of Vasquez's conduct toward Plaintiff or that it altered the terms and conditions of her employment. According to Plaintiff, she fairly flourished in the job and was liked by practically everyone. The conflicts between Plaintiff and Vasquez, however, were apparently often enough to warrant Wubbenhorst's (and therefore McNally's) description of "consistent," and disruptive enough to warrant significant criticism by Wubbenhorst. By Plaintiff's claim, they lasted over a period of years. These considerations and the degree of animosity evidenced by Vasquez to Plaintiff at trial combine to tip the scale in favor of the

thereafter suffered adverse employment actions when her security clearance was suspended, her conditional appointment as a Special Agent was rescinded, and again when her request for reactivation was denied.[17]  Thus, the inquiry is whether Plaintiff's filing the EEO complaint against Vasquez was a substantial, motivating cause of the adverse employment actions that followed.

As noted above, her opposition and the conclusions of McNally were not entirely unrelated as evidenced by the fact that the EEO complaint appears referenced in McNally's conclusion that Plaintiff's response to consistent conflicts with fellow employees and supervisors was initiating "litigious action."  Unfortunately, the court did not hear personally from McNally in this case, but to the extent his testimony came in by deposition, his conclusions were made regardless of Vasquez's EEO complaint and were based on information from Wubbenhorst and from his talking with Plaintiff.  It cannot be doubted that his report about Plaintiff to Tampa management all but sealed Plaintiff's fate in this matter as the loss of a security clearance naturally resulted in a rescission of the offer of conditional appointment as a Special Agent.  Although he denies any undue influence, it would be naive to conclude that McNally's conclusions were not strongly influenced by Wubbenhorst or that,

_____

Plaintiff on this issue.

[17]In this case, the court is not called upon to review the decision by the FBI to suspend the Plaintiff's security clearance.  Here, the FBI itself concluded Plaintiff's security clearance should not have been suspended and it was re-instated.  However, it did not re-instate her into the new agent program and that is the adverse action at issue in this case.  The court accepts the security clearance decisions as historical facts in the case and finds that, under these circumstances, it may scrutinize the ill-advised suspension to the extent it may reflect a retaliatory action under Title VII.

on this record, Wubbenhorst was not attempting to influence the outcome.  However, in the final analysis, the court concludes that it was not the EEO complaint that motivated Wubbenhorst to initiate this EAP process against Plaintiff.  Rather, his initiation of such was motivated by his conclusion that Plaintiff was insubordinate to his authority and dismissive of his counseling.  This conclusion is based not only on the testimony but also the written records which clearly suggest that on more than one occasion, he expressly told her this was the problem which needed to be addressed.

The court also concludes that even if Wubbenhorst was motivated in part by the EEO complaint, Plaintiff would have been sent for EAP counseling, she would have received the same highly negative assessment by McNally, and the consequences of his negative assessment would have been the same.  While the Plaintiff may urge otherwise, her run-ins with Vargas in March 2001 and with Vasquez in June 2001 did reflect a degree of insubordination or at least a lack of respect for authority.  Even if Plaintiff was blameless in the time and attendance matter brought to her attention by Vargas, her response was not.  As for the June run-ins with Vasquez, in the one instance the evidence reveals that Plaintiff had chosen to deliberately circumvent Wubbenhorst's instructions regarding mail and she deserved to be called out on it.  In the other, even if Vasquez instigated the matter, Plaintiff engaged her acting supervisor in a loud argument in the presence of other employees over a very minor matter, an argument that was unprofessional on the part of both women and again evidenced a disrespect for authority.  It does not appear that Plaintiff ever fully grasped the significance of the chain of command to this organization.  Furthermore, Plaintiff did not take criticism well, even when it was constructively given.  On the whole, Wubbenhorst's PAR

22

evaluations and criticisms of Plaintiff were balanced and constructive.  The testimony about how Plaintiff handled criticism as a whole supports that Plaintiff did become angry at Wubbenhorst after the 2001 PAR and remained angry with him thereafter.  In her final PAR, Plaintiff was counseled to improve her relations with her fellow employees and to address her insubordination to Wubbenhorst.  In testimony that was essentially unrefuted apart from Plaintiff's general denials, she failed to do either.  While the circumstances of the EAP process raise significant concerns about its fairness and Wubbenhorst's intentions, the referral of the Plaintiff was not wholly unwarranted in the documented circumstances of this case and certainly is not demonstrated to be in retaliation for the EEO complaint.

Ultimately, it was Burrus who determined that Plaintiff should not be re-instated into the new agent program.  By the time of his decision, there had been an independent work-up of Plaintiff's file.  His conclusion that Plaintiff should not be reinstated into the new agent process due to her poor interpersonal skills and judgment and her refusal to accept responsibility for her actions are not without a basis in fact.  Further, there is simply no way to conclude that he was acting as Wubbenhorst's "cat's paw" in his decision.

As noted above, the conditional appointment as Special Agent was precisely that, conditional.  There were any number of reasons or occurrences that could prevent such an appointment from being realized.  Even if Wubbenhorst had not thrown up his barriers to Plaintiff reaching her goal, there is no assurance, on this record, that Plaintiff would have made it to training at Quantico.

In conclusion, there is no sufficient causal connection between Plaintiff's opposition and the loss of opportunity to become a Special Agent for the FBI.  While Plaintiff may not

23

prevail on her Title VII claim, she may take some solace in the conclusion that this appears to be the FBI's loss and the Department of Health and Human Services' gain.


IV.

The verdict in this non-jury trial is for the Defendant.  The Clerk shall enter judgment accordingly.  The judgment shall include the court's considered decision that each party shall bear their own fees and costs in this action.  Any other ruling would invoke an unfair and inequitable result.

Done and Ordered at Tampa, Florida this 28th day of June 2005.


THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:
Counsel of Record